HARRY L. MIDLER, PLAINTIFF-APPELLANT, v. ABRAHAM M. HEINOWITZ, DEFENDANT-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued November 26, 1951—Decided March 13, 1952.

·Bigelow, J. A. D., dissented.

Before Judges JACOBS, EASTWOOD and BIGELOW.

*Mr. Joseph Kraemer* argued the cause for the plaintiff-appellant.

*Mr. Andrew B. Crummy* argued the cause for the defendant-respondent (*Messrs. Crummy & Consodine*, attorneys).

The opinion of the court was delivered by

EASTWOOD, J. A. D.   The partnership accounting action involved here originated in the former Court of Chancery, the bill of complaint being filed on December 20, 1943. Thereafter, an order was made directing an accounting, with a reference to a special master.   The defendant took numerous exceptions to the master's report, which were heard and determined by the Chancery Division.   On appeal to this court, the ensuing judgment of the Chancery Division was affirmed, with the exception of one item, hereinafter discussed, and the cause was remanded to the trial court for

further consideration and determination. For a more complete understanding of the issues involved between the parties, reference is made to *Midler v. Heinowitz, 6 N. J. Super.* 359 *(App. Div.* 1950).

We are now faced with the consideration of the appeal taken from the judgment of the trial court, respecting the matter remanded to it, holding that the joint venture sales account should be credited with the additional sum of $3,-863.80, representing sales of materials purchased from the Bridgeport Thermostat Company, rather than the sum of $10,599.39, which the special master recommended.

In reaching his conclusion, Judge Freund makes the following statement:

"Granted that the purchase from the Bridgeport Thermostat Company was scrap metal on which, bought in bulk, more than a usual profit might, on resale, be expected, I deemed it unlikely that it would have produced sales of $13,124.09, being sales of $2,524.70 substantiated by sales slips and accounted for by the defendant, plus $10,599.39 estimated by the plaintiff, unaccounted for by the defendant, unsubstantiated by sales slips, but allowed by the master.

Reference to Exhibit C-11 disclosed not only the purchase of scrap iron in the amount of $1,314, from the Bridgeport Thermostat Company, but additional purchases of scrap metals amounting to $832.68, to which I did not find any previous reference. In making allowance for additional sales from what appeared to be additional purchases, I deemed it more equitable to allow comparable sales from additional purchases rather than add on an arbitrary estimated market value of materials purchased and unaccounted for. Accordingly, I concluded that if the defendant accounted for sales of approximately $2,100., from a purchase of $1,314., the joint venture should be entitled on account of all purchases of scrap iron and scrap metal to $3,430.81. Additionally, the defendant had admitted sales of jars in the amount of $432.99. The sum of those two figures is $3,863.80, to which in my opinion the joint venture is entitled on account of its purchases from the Bridgeport Thermostat Company."

In recommending that the venture's sales account is entitled to an additional credit of $10,599.39, the special master, in his report, stated:

"The plaintiff purchased for the joint venture a lot of material itemized in the invoice of the Bridgeport Thermostat Company,

marked in evidence Exhibit C-13. In Exhibit C-11, at p. 7, this purchase is carried as follows:

'Bridgeport Thermostat Co., oil drainer scrap, $1,314.'

Only about 10% of the total amount of this material is credited in the Sales Account of the joint venture in Exhibit C-11. The largest portion consisted of oil drainer parts and rubber hose. The rubber hose was sold. Numerous items went into the part of the stock described as oil drainer parts. Some of these parts were sold and the prices given. Other parts were sold, but the prices at which they were sold were not ascertainable. Other parts may have been sold, and for these the market value was given. The total of these component parts of the oil drainer is $10,059.72; the rubber hose was sold for $539.67. So that the joint venture is entitled to an additional credit in the Sales Account of $10,599.39."

A copy of the original invoice for this purchase was introduced into evidence. It discloses that the "surplus oil drainer stock and scrap" were purchased for the sum of $1,314. The plaintiff testified as to the items appearing on the invoice; that they consisted of 35 items of new parts, comprising 1,156,695 units and 5,904 pounds of scrap iron and scrap metal; that he compared the invoice with the "Sales Account" and found that only approximately ten per cent of the purchase had been accounted for, consisting of paper boxes, glass jars, rubber tubing, and that is about all; describing the article, the number of units and the respective amounts for which the items were sold by the defendant, or if the sale was unknown to him, the market prices thereof; that these items were brand new and salable in the market; that the total of the known sales and market prices for unknown sales for the items not accounted for by the defendant amounted to the sum of $10,059.72; that the invoice also included 53,850 feet of rubber tubing, in addition to which the defendant obtained without charge from the Bridgeport Thermostat Company, 20,000 more feet of the tubing on the claim of shortage; that the defendant only accounted for the sale of 19,883 feet for the sum of $215.98, and that the sales account should be credited with the sum of $539.67, representing the sales value of the 53,967 feet; thus making the total of the unaccounted for sales of parts and tubing, the sum of $10,599.39. The defendant insisted that all of

this material was bought and sold as scrap and fully accounted for.

Judge Freund, in his opinion, states that the bookkeeping methods of the venture are unsatisfactory and "The recurring difficulty of an equitable determination from such a welter of conflicting testimony and records again besets me. * * *" We agree that the aforementioned factors on which Judge Freund places emphasis pose a real problem in the attempt to reach a satisfactory basis for the fixing of the amount with which the venture's sales account should be credited for the Bridgeport item. Presumably, Midler testified from memory as to the sales and market values of the unaccounted for materials. He admitted that he had kept a memorandum "about these transactions," but "not all of them" from 1939 to 1944 and, after telling Mr. Israel Pogash, a certified accountant, "the facts of the contents," he destroyed it some time in 1944. It appears that Midler's destruction of the memorandum book was subsequent to the filing of his complaint in December, 1943.

An examination of the plaintiff's testimony reveals that the only sales with which he was familiar were 4,950 two-quart mason jars to a Brooklyn purchaser at 3¢ each ($148.50), 14,292 mason jars sold "locally" at 3¢ each ($428.76), 21,453 oil drainer cartons, purchaser unknown, which the plaintiff testified "were probably worth 2½¢ a piece ($536.25), and shipment of them, 22,500 were probably worth 10 for 1¢ ($22.50)," and 20,000 feet of rubber tubing which was accounted for at a sales price of $215.98. These sales amount to a total sum of $1,350.99. Therefore, to accept the contention of the plaintiff that the venture's sales account should be credited with the additional sum of $10,599.39, we must unqualifiedly accept the plaintiff's testimony from memory as to the market value of the items allegedly unaccounted for at prevailing market prices, for a period of time several years prior to the date of Midler's testimony. Midler's testimony as to the market prices impresses us as lacking the necessary elements of certainty and

reliability. To illustrate, he said that the market prices of the bakelite filler tubes were *about* 30¢; that the zinc die-cast receptacles "had no resale value only as scrap, and the scrap price at that time, if I remember correctly, was somewhere around 4½¢ a pound, and I imagine, if I remember correctly, they would weigh about half a pound each"; that as to the dust caps, "I believe the resale value of those would be about two cents each"; that the value of the rubber tubing as brand new "was approximately about 2 to 2½ cents per feet. I don't know the exact market"; that "I imagine the value of that (brass valve gauges) would be probably about a quarter of a cent apiece"; that he could not put any value on 192 pieces of assembly in brass as "I don't know what it is. I don't remember it"; that the value of the brass valve stems would be "about 2¢," *et cetera*. On the defendant's exception to the master's finding, he conceded sales of 54,440 feet of hose, $599.60, jars, $432.99, six listed purchases purporting to be represented by invoices found in D-14, $1,517.21, totaling $2,549.80; however, some of these sales do not appear in the defendant's records. The trial court found that total sales of $2,100 were substantiated by sales slips and accounted for by the defendant, and that the defendant should also be charged with the admitted unaccounted for sales of jars, amounting to $432.99, as well as additional sales of scrap materials amounting to $832.68, and a profit thereon, which based upon the profit of the other sales, the court calculated to be $498.13, thus determining as a fact that the total sum of sales to be credited to the joint venture is $3,863.80.

In view of the lack of proof of any additional sales other than those with which the Chancery Division charged the defendant, and the rather unconvincing testimony of the plaintiff concerning the market value of the unaccounted for alleged sales, we do not feel that we are warranted in setting aside the Chancery Division's determination.

Through the courtesy of Judge BIGELOW we have had the opportunity of reading his proposed dissenting opinion. We

are not in disagreement with respect to the legal principles set forth therein. However, in view of the factual situation recounted in the foregoing opinion, we think the cited cases are not controlling here.

The judgment is affirmed, with costs.

BIGELOW, J. A. D. (dissenting). One partner sues to compel the other partner, the defendant, to disgorge the proceeds of partnership assets that he had fraudulently converted to his own use. The only subject of the present phase of the appeal is miscellaneous material bought by the partnership from Bridgeport Thermostat Company for $1,314 under invoice dated September 28, 1938, and marked exhibit C-13. The defendant admits the purchase, and that the materials came to his yard, and in effect that he is accountable for them. The following is a list of the materials copied from the invoice. Where a second amount is shown in parentheses, it is the figure apparently used by the master. The unit values are those given by Midler, the plaintiff. Where no value is shown, the defendant was not surcharged with the item.

| | Oil burner quantities are approximate. | | |
|---|---|---|---|
| 8,194 (3,194) | Bakelite filler tubes | @ 3¢ | $ 95.82 |
| 42,503 | Zinc die cast receptacle | @ 2¼¢ | 956.34 |
| 37,730 | C R S dust cap | @ 2¢ | 754.60 |
| 2,300 | Copper and steel oil tube sub-assembly | @ 14¢ | 322.00 |
| 53,850 ft. (53,967) | Rubber tubing, ¼″ ID x ⅛″ wall | @ 1¢ | 539.67 |
| 44,920 | Brass valve gage | @ .0025 | 112.30 |
| 41,680 | Steel cap spring | @ .0025 | 104.20 |
| 42,718 | Steel bottle cap | @ 1¢ | 427.18 |
| 44,140 | C R S mounting stud 3″ | @ 2¢ | 882.80 |
| 192 | Assem. brass | | |
| 43,575 | Brass valve stem | @ 2¢ | 871.50 |
| 44,575 | Brass valve guide | @ 1¢ | 445.75 |
| 34,601 | Zinc die cast tubing tee | @ 1¢ | 346.01 |
| 39,725 | Steel mounting stud check nut | @ .0025 | 99.31 |
| 42,825 (42,000) | Steel mounting stud nut | @ .0025 | 105.00 |

| | | | |
|---|---|---|---|
| 84,484 | Steel large mounting washer | | lot 5.00 |
| 57,679 | Black rubber gasket | @ 5¢ doz. | 240.30 |
| 63,550 | Fibre gage gasket | | |
| 3,275 | Vacuum valve assm. D2, 7, 15 & 16 | @ 14¢ | 458.50 |
| 40,850 | Steel tubing clip | | |
| 39,853 | Brass tube coupling (Coupling, nut and sleeve) | @ 3½¢ | 1,394.86 |
| 446 | Complete receptacle assm. | @ 14¢ | 62.44 |
| | Machinery | | |
| 5 | Eisler 6-unit vacuum pumps, Nos. 7601-6 | @ $60. ea. | 300.00 |
| 2 | Southwark hydraulic pumps, Nos. 7235-6 | @ $60. ea. | 120.00 |
| 1 | Blower, B. B. Co. No. 531 | | |
| | Scrap | | |
| 347 lbs. | Heavy brass-clean; old accumulator fittings | | |
| 880 lbs. | Heavy brass and iron, old accumulator fittings | | |
| 1,783 lbs. | Mixed metal, brass, copper and solder | | |
| 714 lbs. | Clean copper-tubes and bulbs | | |
| 1,563 lbs. | Mixed metal and iron | | |
| 117 lbs. | | | |
| 5,404 lbs. (5,401) | | @ 7½¢ | 405.07 |
| 500 lbs. | Scrap iron accumulator | @ $12. ton | 3.00 |
| 4,950 | 2-quart mason jars BM90-C8 | | |
| . . . | The following oil drainer parts not yet shipped, part of which are in storage at the warehouse of C. Rickard & Son: | | |
| 14,292 | 2-quart mason jars BM90-C8 | | |
| 21,463 | Individual oil drainer cartons | @ ¼¢ | 53.66 |
| 23,500 | Single oil drainer trays | @ 1/10¢ | 23.50 |
| 34,751 | Oil drainer packing pads | @ 1/10¢ | 34.75 |
| 49,900 | Oil drainer pads | @ 1/10¢ | 49.90 |
| 5,145 | Oil drainer carton holding 6 ind. cartons | @ 12¢ | 617.40 |
| | | | $10,599.39 |

The special master to whom the accounting was referred accepted the values given above and charged the defendant in favor of the partnership with $10,599.39. He wrote:

"(e) The plaintiff purchased for the joint venture a lot of material itemized in the invoice of the Bridgeport Thermostat Company, marked in evidence Exhibit C-13. In Exhibit C-11, at p. 7, this purchase is carried as follows:
'Bridgeport Thermostat Co., oil drainer scrap, $1,314.'
Only about 10% of the total amount of this material is credited in the Sales Account of the joint venture in Exhibit C-11. The largest portion consisted of oil drainer parts and rubber hose. The rubber hose was sold. Numerous items went into the part of the stock described as oil drainer parts. Some of these parts were sold and the prices given. Other parts were sold, but the prices at which they were sold were not ascertainable. Other parts may have been sold, and for these the market value was given. The total of these component parts of the oil drainer is $10,059.72; the rubber hose was sold for $539.67. So that the joint venture is entitled to an additional credit in the Sales Account of   .  .. ...   .  ... . $10,599.39"

To this finding, the defendant excepts as follows:

"Exhibit C-13 is an invoice from Bridgeport Thermostat Co., dated September 28, 1938, in the amount of $1,314. The duplicate invoices C-14 show that 54,440 feet of hose was sold for   $   599.60
*        *        *        *        *        *        *        *
Papers, cartons and boxes were sold for (net)   ...  .        297.00
Copper tubing was sold for (See invoice)          .         26.14
1 Blower was sold for    . ... ...   .  .  . ...           5.00
Washers, Nuts and Bolts were sold for          ...        354.86
Fittings were sold for    .            ...    .  ..        828.81
719 No. Pins were sold for   .    .. .  .    .....           5.40

                                                        $ 2,116.81
The purchase and sale of the jars are accounted for at
     the price of   .   .. .. ..   ... .      .          432.99

Total sales of Bridgeport merchandise     . ..    ... $ 2,524.70
               (Correct total)   ....            ..    $ 2,549.80
     The Master charges the defendant with additional sales of $10,-599.36. One will search in vain to substantiate any such figure."

The intent of the exception is not entirely clear. Certainly it does not challenge the unit values that the master adopted for the several items. The true ground for the exception

seems to have been that the defendant had already accounted in his schedule of sales, C-11, for some of the items, and that the master, by surcharging the defendant's account in the sum of $10,599.39, charged the defendant twice for the items that are listed in the exception.

The learned judge of the Chancery Division reduced the surcharge from $10,599.39 to $3,863.80. His explanation follows:

"Granted that the purchase from the Bridgeport Thermostat Company was scrap metal on which, bought in bulk, more than a usual profit might, on resale, be expected, I deemed it unlikely that it would have produced sales of $13,124.09, being sales of $2,524.70 substantiated by sales slips and accounted for by the defendant, plus $10,599.39 estimated by the plaintiff, unaccounted for by the defendant, unsubstantiated by sales slips, but allowed by the master.

Reference to Exhibit C-11 disclosed not only the purchase of scrap iron in the amount of $1,314 from the Bridgeport Thermostat Company, but additional purchases of scrap metals amounting to $832.68, to which I did not find any previous reference. In making allowance for additional sales from what appeared to be additional purchases, I deemed it more equitable to allow comparable sales from additional purchases rather than add on an arbitrary estimated market value of materials purchased and unaccounted for. Accordingly, I concluded that if the defendant accounted for sales of approximately $2,100, from a purchase of $1,314, the joint venture should be entitled on account of all purchases of scrap iron and scrap metal to $3,430.81. Additionally, the defendant had admitted sales of jars in the amount of $432.99. The sum of those two figures is $3,863.80, to which in my opinion the joint venture is entitled on account of its purchases from the Bridgeport Thermostat Company."

As I understand the memorandum, the judge noticed in defendant's account items of metal purchased from Bridgeport Thermostat Company totaling $832.68, which were not part of the particular Bridgeport transaction, invoice C-13. Instead of coupling the purchases with the sales items of scrap metals, shown in the same account, he assumed that the metal mentioned in the purchase items ("to which I did not find any previous reference") was not accounted for in defendant's account or charged against him in the master's report. He considered that a reasonable resale price for that metal would be $1,330.81, which is 60 per cent above the cost

of $832.68. So he surcharged the defendant in that sum. He also surcharged defendant with sales which defendant admitted in the exception, hose, scrap metal, etc., $2,116.81 (taken as "approximately $2,100"), and jars $432.99. The sum of these figures, $1,330.81, $2,100 and $432.99, is $3,863.80, to which amount the court reduced the surcharge on the Bridgeport materials covered by the invoice of September 28, 1938. Surely the method adopted by the learned judge needs no comment. Not even defendant attempts to uphold it.

The law that governs the accounting is so well known that citation of authorities is almost superfluous. A fiduciary is in duty bound to keep clear and detailed accounts. If he fails to do so and the amount owing by him to the beneficiary is uncertain, doubts must be resolved in favor of the beneficiary. *In re Gaston Trust,* 35 *N. J. Eq.* 60 (*Ch.* 1882), affirmed *sub nom. Veghte v. Steele,* 35 *N. J. Eq.* 348 (1882). Partners occupy confidential relations toward each other. *Sonek v. Hill B. & L. Ass'n.,* 138 *N. J. Eq.* 534 (*Ch.* 1946), affirmed 140 *N. J. Eq.* 108 (*E. & A.* 1947). If, by agreement between them, one of the partners undertakes to keep the partnership accounts, the rule just mentioned applies, and in case of doubt arising from his neglect to keep proper accounts, he is the one who must suffer. *Van Ness v. Van Ness,* 32 *N. J. Eq.* 669 (*Ch.* 1880), reversed on another point 32 *N. J. Eq.* 729 (*E. & A.* 1880). Defendant admitted that he and plaintiff agreed that the books of account should be kept at defendant's office, by his employee, Tracy. Plaintiff had nothing to do with the accounts.

Upon an accounting, whoever seeks to surcharge the accountant has the burden of proving that the questioned asset came into the fund. Then the burden shifts and the accountant must show what became of the asset. *Silverthorn v. Brands,* 42 *N. J. Eq.* 703 (*E. & A.* 1887); *Dufford v. Smith,* 46 *N. J. Eq.* 216 (*Prerog.* 1889). In the case before us, the defendant admits that the joint venture purchased from the Bridgeport company the materials listed in the

invoice of September 28, 1938, and that the materials were brought to his yard and warehouse. The burden of accounting for the materials rests squarely on him. The special master found that he had not accounted for any of this material for which a value is stated in the above schedule, and surcharged him accordingly. By exceptions, the defendant challenged the surcharge on the ground that he had already accounted for some of the items. Let us examine these items separately.

It must be remembered that the defendant is charged with nothing in the final judgment except the items appearing in his account, C-11, or in one of the surcharges reported by the master, as modified by the court. A sale may be shown in the invoices marked C-14, but it does not affect the judgment unless it also appears in C-11 or in a surcharge.

The Bridgeport invoice includes 53,850 feet of rubber hose. According to plaintiff's testimony, although this amount of hose was received, the defendant made claim of a shortage and the Bridgeport company provided an additional 20,000 feet. Confirmation of this testimony is given by defendant's account, C-11, which shows receipt of 20,000 feet, "n/c," meaning no charge. Defendant asked allowance in the account for 19,883 feet sold at near 1 1/10 cents, $215.98, leaving unexplained 53,967 feet, which the master charged to him at one cent a foot, $539.67. The surcharge is justified. Defendant admits selling hose for $599.60 and perhaps this should have been the amount of the rubber surcharge. If so, it is the plaintiff and not the defendant who is aggrieved.

Defendant accounted in C-11 for the Mason jars, $432.99, for the blower, $5, and for pins, $5.40. The master did not surcharge him with the jars, blower or pins.

Defendant's exception lists sale of papers, cartons and boxes, $297, which doubtless refers to an item in C-11, paper sold to Aetna Corrugated Box, $297. The only item in the Bridgeport invoice that this could be part of is "5145 Oil drainer cartons, holding 6 ind. cartons" valued by Midler

at 12 cents per carton, making $617.40. The defendant had the burden and did not even attempt to prove an identity of the items. The exception in this respect is a mere after-thought, unsupported by any evidence.

The other items listed in defendant's exception—copper tubing, $26.14, washers, nuts and bolts, $354.86; fittings, $828.81—may or may not be part of the materials included in the Bridgeport purchase and may or may not be accounted for in C-11. The defendant had the onus of both branches of the proof and did not even try to meet either one.

Now as to the unit value of the materials for which defendant is accountable. Plaintiff, on December 6, 1946, testified to these values. No objection was made that he was not a competent expert, and he was not cross-examined on the subject of values, although he was cross-examined on other matters March 7 and April 25, 1947. The defendant testified on July 31, 1947, but did not contradict plaintiff's testimony as to values in any respect. The values to which plaintiff testified seem fair when tested by selling prices which defendant admitted he received: Rubber hose at 1 cent against 1 1/10 cents admitted; metal scrap at $7\frac{1}{2}$ cents, only half of the average scrap price shown in C-11. The master was justified in accepting Midler's values as a basis for his calculation; nay, he would have erred had he done otherwise.

In my opinion, the judgment of the Chancery Division should be reversed and the surcharge of $10,599.39 reported by the master should be approved, with interest. While a court of equity has considerable control over the allowance of interest, it would be a capricious exercise of power to relieve the embezzler of the burden of interest.